**Marvin BUSH and Jerry Bolton,
Petitioners,**

v.

**STATE of Tennessee, Respondent.**

Supreme Court of Tennessee.

Aug. 16, 1976.

Michael R. Jones, J. Travis Price, Springfield, for petitioners.

R. A. Ashley, Jr., Atty. Gen., Robert E. Kendrick, Deputy Atty. Gen., Nashville, O'Brien Price, Dist. Atty. Gen., Springfield, for respondent.

## OPINION

FONES, Justice.

We granted the writ of certiorari in this case and a case styled *Turner v. State of Tennessee*, Tenn., 541 S.W.2d 398, to clarify the presumption or inference that may be drawn from proof of possession of recently stolen property. Our opinions in the two (2) cases are being released simultaneously.

Marvin Bush, Jerry Bolton and Shadrack Dean were indicted, tried and convicted of second degree burglary of the home of Charles Moffett. Dean did not appeal. Bush and Bolton appealed from sentences of not less than three (3) nor more than fifteen (15) years each. All of the assignments of error on behalf of Bush and Bolton in the intermediate appellate court and here relate to the alleged insufficiency of the evidence to convict.

The Court of Criminal Appeals affirmed both convictions. A dissenting member of the panel was of the opinion that the evidence clearly established that, ". . . Bolton was in possession of the stolen guns before Bush became aware of their existence." He concluded from that finding, that the majority had permitted the inference arising from possession of recently stolen goods to set aside the presumption of innocence. We granted the writ of certiorari in both cases.

### I.

We deem it pertinent to state the substance of the testimony of the material witnesses in the chronological order that the evidence was adduced at the trial.

Charles Moffett testified that on January 23, 1974, he locked and left his home about 11:30 a. m.; and when he returned approximately one hour and fifteen minutes later, he found the back door had been forced and shattered and three (3) rifles, a shotgun and a wrist watch were missing. His home was situated at the dead end of a county road about two hundred (200) yards long that runs off Sandy Springs Road in Robertson County. Only two (2) other houses are on the dead-end road, the Langford house and the Edwards house. Moffett observed that the road had been recently graded, and after discovery of the robbery he examined the road bed and found that no motor vehicle had traversed the road to his house, other than his own. He worked on custom rifles and his home had been robbed before. He identified the four (4) guns and gave his opinion of their value.

Joe Robertson, an investigator with the Sheriff's Office, testified that shortly after question Billy Walker, owner of the Burley Cafe, as to his knowledge of any stolen guns, Walker arranged to meet him and turned over to him a trash or garbage bag containing four (4) guns. The four guns were shown to be those identified by Moffett as having been stolen from his home on January 23.

An FBI fingerprint expert testified that he found Marvin Bush's fingerprints on one of the rifles and the shotgun. Although he

was able to lift other fingerprints from the guns he was not, ". . . able to identify any other parties by any finger prints."

Ruthie Trogdon testified that on January 23, 1974, she was living with her sister and brother-in-law, the McKinneys, who were renting the Edwards house on the same dead-end road where the Moffett house was located. She was divorced and had been "going with" Marvin Bush for about a year; that he had stayed overnight at the Edwards house the night before and the night after the robbery. On cross-examination by counsel for Bolton, she "guessed" that she had spent the night with him more often than not since their relationship began. She admitted that she was "still going with" Bush at the time of the trial. She testified that Bolton appeared at the Edwards house about 1:00 p. m., she didn't know how he got there, she didn't see a car; that he asked Bush to carry him to town. Since this testimony is said to exonerate Bush from any participation in the burglary, we quote from the record:

"Q. And what did Mr. Bolton have to say?

A. He said he had gotten some guns or something like that. I don't know now just exactly what he said, and I don't want to say anything to hurt the boy because I can't remember exactly what he did say, his exact words, but Marvin did take him to town.

Q. So Mr. Bolton came in and announced that he had gotten some guns?

A. No, he didn't announce it. He was talking to Marvin.

Q. He was talking to Marvin?

A. He was talking low enough that I just didn't catch what he was saying, because I didn't figure it was any of my business.

Q. You didn't hear all the conversation?

A. No, I didn't.

Q. But he did say he got some guns?

A. Yes, sir.

Q. You did hear that?

A. Yes.

Q. But there was other conversation there?

A. Well, not that much. Marvin left and took him to town.

Q. Mr. Bolton was speaking directly to Mr. Bush and you overheard part of that conversation?

A. Yes, sir. It's hard to hear when you have children and the television going.

Q. Do you know how Mr. Bolton got to your house?

A. No, sir, I sure don't.

Q. Did you notice whether or not he was traveling in an automobile?

A. No, sir, I don't know how he got there. The way the road is made if you come to the house you have almost got to go down to the two little houses below or either come right around the driveway. I didn't see any cars.

Q. You did not see any cars?

A. No.

Q. Did you see any guns?

A. No.

Q. Did you hear Mr. Bolton make any reference to where these guns were?

A. No, sir, I sure didn't. Marvin brought him to town, but he didn't stay gone but just a few minutes."

She testified that Bush came back alone, that they watched TV until an hour or so before dark and then drove to town, where Bush parked his car in a little driveway between the Burley Cafe and a car lot; that she remained in the car but Bush walked around to the back of Burley's Cafe where Shadrack Dean's car was stopped with its trunk open, at the rear door of the Cafe. She identified Dean, Billy Walker and Bolton as having been present with Bush at the open trunk of Dean's car, but disclaimed any knowledge of what they were doing or of seeing any guns or any money change hands. She said that Bush returned to the car after a very few minutes; they rode around awhile, ate a sand-

wich and returned to the Edwards house. She said that her sister and brother-in-law had moved away and she did not know where they were.

Billy Walker, a retired service man and the owner of Burley Cafe, testified that after receiving a telephone call from Dean, Bush and Dean brought four (4) guns to the back door of the Burley Cafe in the trunk of a vehicle. Walker bought them for seventy-five ($75) dollars cash and gave the money to Dean. A third man was with them who was about the size of Bolton but he could not say that Bolton was or was not that person. He did not see them divide the money, but they came inside the Cafe, had one or two beers and left. He put the guns in a trash bag and later turned them over to the police.

Following the State's proof, Bolton testified in his own behalf. His entire relevant testimony consisted of denying that he was present at the Edwards house or the Burley Cafe on January 23, 1974. He was not cross-examined by the State or by counsel for either of the other two defendants. He did not deny that he stole the guns, nor did he deny receiving any money for the sale of the guns.

Shadrack Dean testified that Bush and Bolton came to his house and asked if he knew where they could sell some guns; that Bush's mother's house was located three or four houses down the street and that he went there and inspected the four (4) guns in Bush's car. He then called Billy Walker, put the guns in the trunk of his car and drove to the Burley Cafe, accompanied by Bush and Bolton, and sold the guns to Billy Walker for seventy-five ($75) dollars. He kept fifteen ($15) dollars and gave Bush and Bolton thirty ($30) dollars each. He testified that all of these events occurred around 2:00 p. m. or 2:30 p. m. He said that Bush's car remained at his mother's house while they went to the Cafe to sell the guns. He was asked if he had heard Ruthie Trogdon testify about coming to

town with Bush in his car and sitting in the driveway at the time of the transaction with Billy Walker. His response was, "She told a lie." He admitted that he, Bush and Bolton were good friends and had run around together but denied being with them before they came to his house about 2:00 or 2:30 p. m. on January 23. He said that his involvement with them on the day of the robbery covered a period of approximately thirty (30) minutes; that Bolton was "pretty well strung out" and did not converse with anybody.

Dean's mother testified that he was home all day on January 23, keeping the children while his wife worked, except for thirty (30) to forty-five (45) minutes sometime in the afternoon, before leaving at 4:00 p. m. to pick up his wife.

Bush did not testify.

## II.

■ In Tennessee we follow the generally approved rule that proof of possession of recently stolen goods gives rise to the inference that the possessor has stolen them. *Peek v. State*, 213 Tenn. 323, 375 S.W.2d 863 (1964); *Hughes v. State*, 27 Tenn. 75 (1847); *Cook v. State*, 84 Tenn. 461, 1 S.W. 254 (1886); and *Shaw v. State*, 1 Tenn.Cas. 77 (1858).

The dissenting member of the Court of Criminal Appeals repeats here the substance of his dissent in *Smith v. State*, 2 Tenn.Cr.App. 117, 451 S.W.2d 716 (1969).

In the instant case, he accuses the majority of relying upon the proposition, "that possession alone, although explained in a credible fashion may support a finding of guilt." It appears that the dissenter entertains the view that if possession alone is relied upon for conviction and it is "rebutted by evidence that is not patently false,"[1] or "explained in a credible fashion,"[2] the presumption or inference should disappear, with the result that there remains no jury issue. We do not believe that to be the law in this State.

---

1. *Smith v. State, supra*, at 721.

2. *Bush and Bolton v. State*, Court of Criminal Appeals, Dissenting Opinion, filed October 15, 1975.

In McCormick On Evidence, Second Edition, Dean McCormick ventures the assertion, ". . . that 'presumption' is the slipperiest member of the family of legal terms, except its first cousin, 'burden of proof.' One author has listed no less than eight senses in which the term has been used by the courts." Section 342, at 802, 803.

Black's Law Dictionary, Fourth Edition, defines a presumption of law as "A rule of law that courts and judges shall draw a particular inference from a particular fact, or from particular evidence, unless and until the truth of such inference is disproved."

■ Definitions of presumption and inferences with different shades of meaning and in direct conflict may be found in great abundance in the reported cases. On the issue of whether the presumption vanishes or remains to be weighed by the jury, we believe the correct rule to be found in the following quote from the opinion of *H. G. Hill Co. et al. v. Squires*, 25 Tenn.App. 164, 153 S.W.2d 425 (1941):

"A legal presumption is a fiction of the law and is an assumption for convenience, but where proof to the contrary is introduced, the assumption is waived for it is no longer logical to assume a fact which is refuted by positive testimony. *Frank v. Wright*, 140 Tenn. 535, 543, 205 S.W. 434. But instances arising from proven circumstances take on a higher quality of evidential value, and to deny by positive proof the inference arising from the circumstances will not destroy it, otherwise tracks, finger prints, etc., would have no evidential value so long as the defendant was willing to deny them. So, an inference arising from proven circumstances is of a higher character of evidence than a legal presumption and the inference is not destroyed by contradictive testimony." 25 Tenn.App. at 167, 168, 153 S.W.2d at 427.

■ While it may be said that the presumption assuming guilt of the theft must be discarded when the defendant comes forward with an explanation, the inference arising from the proven fact of possession of recently stolen property is not destroyed by contradictory evidence, even the positive testimony of witnesses:

"'The presumption of law disappears in the face of substantive evidence to the contrary, provided the evidence is not impeachable from the record, but circumstantial evidence may contradict the positive testimony and corroborate the presumption. If this were not the fact it would be impossible to convict the defendant when he was of a mind to deny proven circumstances. The inference arising from the circumstantial evidence is of higher evidential quality than a mere presumption of law; a logical and legitimate inference arising from proven circumstantial facts cannot be destroyed as a matter of law by the positive testimony of witnesses; there is then established a conflict of testimony to be determined by the jury. We do not think it necessary to enter into a review of the authorities to establish this point.'" 25 Tenn.App. at 168, 153 S.W.2d at 427. (Quoting from an unpublished opinion.)

Thus, in our view, the circumstantial force of the inference does not "vanish" upon the appearance of defendant's explanation. It remains to be weighed by the jury against the evidence offered by defendant in explanation of his possession of the recently stolen property.

We believe this view to be consistent with *Barnes v. United States*, 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973), where the Court was dealing with the related inference of knowledge that the property was stolen, arising from proof of possession of recently stolen property.

"[T]he mere fact that there is some evidence tending to explain a defendant's possession consistent with innocence does not bar instructing the jury on the inference. The jury must weigh the explanation to determine whether it is 'satisfactory.' [citation omitted]. The jury is not bound to accept or believe any particular explanation any more than it is bound to accept the correctness of the inference.

But the burden of proving beyond a reasonable doubt that the defendant did have knowledge that the property was stolen, an essential element of the crime, remains on the Government." 412 U.S. at 845, n. 9, 93 S.Ct. at 2362.

The reason for the presumption is that proof of possession of recently stolen property gives rise to the probability that the possessor stole the property. The evidence of possession, sufficient to invoke the presumption, is seldom, if ever, alone. It necessarily establishes the time and distance relationship between the burglary or theft and the possession by defendant. Frequently the defendant's proximity to the place of taking and his opportunity or lack of opportunity to have committed the theft are revealed by some circumstance accompanying the proof of possession. In short, the evidence of possession is almost inevitably accompanied by facts that either increase or decrease the degree of probability. Thus the evidence of possession sufficient to invoke the presumption will vary widely from case to case; and at one end of the spectrum, the degree of probability that defendant committed the theft will be so strong that a clear and cogent explanation may be necessary to convince a jury that the presumption has been overcome, while at the other end of the spectrum, a reasonable explanation of much less probative value will suffice.

Of course, the trial judge may direct a verdict for a defendant, when under the test applicable to all criminal cases, the explanation of the defendant so overcomes the circumstantial force of the inference that there is insufficient evidence to warrant a conviction.

We expressly reject the suggestion by the dissenter that this presumption is subject to the same treatment as the inference in a civil case that arises from proof of ownership of an automobile that the driver is about the business of the owner.

## III.

On the other hand, we are of the opinion that insofar as our cases hold that unexplained possession of recently stolen goods raises a conclusive presumption of guilt, they are out of step with the weight of authority in our sister states and contrary to decisions of the United States Supreme Court. See *Thomas v. State*, 225 Tenn. 71, 463 S.W.2d 687 (1971), *Barnes v. United States, supra.*

The various statements of *unexplained* possession said to give rise to a conclusive presumption of guilt have their origin in *Shaw*. Following excerpts from Greenleaf, Phillips and Cowan and Hill's notes on Phillips, the Shaw Court proclaimed:

"The true rule seems to be, that the possession of stolen goods is always competent evidence without regard to time, though insufficient of itself, after a considerable lapse of time. If it be recent, it is conclusive, unexplained; if remote, additional circumstances of suspicion, arising out of the prisoner's language or conduct, before or after the larceny, his false accounts of it, or his proximity to the time and place of taking, are necessary to raise the presumption of guilt; that is, in the one case it is not sufficient per se, and in the other it is, when unexplained." 1 Tenn.Cas. at 78.

Jury instructions molded to express the true rule or the Greenleaf rule or the Phillips rule may be found in subsequent cases, and generally has been approved, although criticized in *Thomas*.

In *Barnes* the court reviews prior decisions involving due process attacks on statutory inferences.[3] It expressly holds that if a statutory inference satisfies the reasonable doubt standard,[4] as well as the more-likely-than-not standard, it may be submitted to a jury as sufficient to support

---

3. Common-law inferences are subject to the same rules, insofar as here pertinent. *Id.*, 412 U.S. at 845, n. 8, 93 S.Ct. at 2357.

4. "[T]hat is, the evidence necessary to invoke the inference is sufficient for a rational juror to find the inferred fact beyond a reasonable doubt." *Id.* at 843, 93 S.Ct. at 2362.

a conviction. We think it is clearly implicit, if not explicit, from the entire opinion, that while the jury *may* find unexplained circumstances sufficient to invoke the inferred fact and support a conviction, it is not bound to accept the correctness of the inference. It follows that it is improper to instruct a jury that a presumption of guilt arises, that if unexplained, is conclusive, or any words of similar import.

■ The jury instruction given by the trial judge in *Barnes* provides a model for the framing of an appropriate instruction whether the inferred fact is knowledge that the property had been stolen or that the possessor was the thief.[5] In *Barnes*, the defendant did not testify. Where defendant testifies, of course, there is no occasion to include the reminder of his constitutional right of silence. Where defendant offers an explanation, the instruction should make it clear that the jury must determine both the correctness of the inference and the weight to be given the explanation, that it is not bound to accept either and that the burden of proving guilt of the offense beyond a reasonable doubt remains on the State.

Thus, *Shaw* and its progeny are overruled to the extent of inconsistency with the foregoing.

## IV.

We disagree with the contention of defendant Bush and the dissenting Judge that the explanation of Ruthie Trogdon has overcome the inference. The evidence of his possession of the stolen property is so near in time to the theft as to render the possibility almost non-existent that some other person with whom they were not involved as principals committed the theft and transferred possession to them. The evidence supports opportunity by their proximity to the place of the theft at or near the time it was committed. The evidence that they effected a sale of the stolen property within two or three hours after the theft occurred in a manner and at a price consistent with stolen property sales, lends considerable circumstantial force to the inference. Obviously, this is not a case in which it can be said that the force of the presumption rests on "possession alone."

It is asserted that Ruthie Trogdon testified that Bush was at the Edwards house all morning, and that he did not leave until he and Bolton drove to town after 1:00 p. m., thus, it follows that he could not have participated in the burglary. That contention is based upon the following question and answer: "Q. Who else was present that morning? A. My sister and the kids and

---

5. "Possession of recently stolen property, if not satisfactorily explained, is ordinarily a circumstance from which you may reasonably draw the inference and find, in the light of the surrounding circumstances shown by the evidence in the case, that the person in possession knew the property had been stolen.

"However, you are never required to make this inference. It is the exclusive province of the jury to determine whether the facts and circumstances shown by the evidence in this case warrant any inference which the law permits the jury to draw from the possession of recently stolen property.

"The term 'recently' is a relative term, and has no fixed meaning. Whether property may be considered as recently stolen depends upon the nature of the property, and all the facts and circumstances shown by the evidence in the case. The longer the period of time since the theft the more doubtful becomes the inference which may reasonably be drawn from unexplained possession.

"If you should find beyond a reasonable doubt from the evidence in the case that the mail described in the indictment was stolen, and that while recently stolen the contents of said mail here, the four United States Treasury checks, were in the possession of the defendant you would ordinarily be justified in drawing from those facts the inference that the contents were possessed by the accused with knowledge that it was stolen property, unless such possession is explained by facts and circumstances in this case which are in some way consistent with the defendant's innocence.

"In considering whether possession of recently stolen property has been satisfactorily explained, you are reminded that in the exercise of constitutional rights the accused need not take the witness stand and testify.

"Possession may be satisfactorily explained through other circumstances, other evidence, independent of any testimony of the accused." *Id.* at 840, n. 3., 93 S.Ct. at 2360.

**398** ▪ ▬▬▬▬▬▬▬▬▬▬▬▬▬

myself and Marvin and Mickey come home about dinner."

Obviously dinner refers to the noon meal. The State insists that her answer means that Marvin Bush was away from the Edwards house part of the morning and that he and her brother-in-law, Mickey, returned about dinner. The jury either interpreted her answer in accord with the State's version, or did not believe her attempt to protect her lover. In either case, the ambiguity of her testimony is such that it will not support defendant Bush's contention that it is sufficient to exonerate him from the burglary. The same may be said of her testimony that she overheard Bolton saying that, ". . . he had gotten some guns or something like that. I don't know now just exactly what he said . . . ."

■ We agree with the majority of the Court of Criminal Appeals in rejecting the contention that the State is bound by every fact testified to by Ruthie Trogdon. The rule that a party cannot impeach his own witness, except in certain circumstances, does not forbid him from presenting and relying upon contradictory evidence, testimonial or circumstantial. It is for the court and jury to sift the evidence, weigh it and decide where the truth lies. *See State v. Silva,* 477 S.W.2d 517 (Tenn.1972); *Hewgley v. General Motors Acceptance Corporation,* 39 Tenn.App. 553, 286 S.W.2d 355 (1955).

While the State is bound by the same rules applicable to other parties, the wisdom of the rule is more readily apparent in the case of the State, because of the special obligation of the prosecution to bring forward all available witnesses. *See King v. State,* 187 Tenn. 431, 215 S.W.2d 813 (1948).

### V.

■ Because we are unable to say that the instruction given by the trial judge did not prejudice the rights of these defendants, we must reverse and remand these cases for a new trial.

The charge given was as follows:

"Recent possession of personal property proven to have been stolen, unexplained, is plenary proof of guilt. It creates a strong presumption of guilt and in the absence of explanation, if in the power of the defendant or defendants to explain, must necessarily make evidence of guilty possession stronger. In fact, the recent possession of stolen articles under these circumstances, would not merely be a strong circumstance, but raise a presumption of guilt upon which the jury should convict."

We believe it is fair to say that the instruction goes beyond the scope of any rule to be gleaned from *Shaw.* The last sentence, in particular, was tantamount to an express direction from the trial judge to return a guilty verdict.

The convictions are reversed and the cases remanded to the trial court of Robertson County for a new trial consistent with this opinion.

COOPER, C. J., and HENRY, BROCK and HARBISON, JJ., concur.