IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 9, 2019

## STATE OF TENNESSEE v. TRENTON RAY FORRESTER

**Appeal from the Circuit Court for Henderson County**
**No. 18032-2    Donald H. Allen, Judge**

_____

### No. W2018-01947-CCA-R3-CD

_____

The defendant, Trenton Ray Forrester, aggrieved of his Henderson County Circuit Court jury convictions of aggravated burglary and theft of property valued at more than $1,000 but less than $2,500, appeals, challenging the sufficiency of the convicting evidence and the propriety of the fully-incarcerative, six-year effective sentence. We affirm both the conviction and the accompanying sentence. Because, however, the trial court failed to consider the defendant's ability to pay when setting the amount of restitution, we reverse the restitution order and remand the case for a new restitution hearing.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed in part; Reversed in part; Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. ROSS DYER, JJ., joined.

Hayley F. Johnson, Assistant District Public Defender, for the appellant, Trenton Ray Forrester.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Angela Scott, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Henderson County Grand Jury charged the defendant with aggravated burglary and theft of property valued at more than $1,000 but less than $2,500 related to the September 26, 2017 burglary of the residence of James Donnelly, Jr., and the theft of property therefrom.

At the June 2018 trial, the victim, James Donnelly, Jr., testified that he had known the defendant since 2013 and that the defendant lived with him for a period of time in 2014. The defendant also worked for the victim periodically. The victim also said that he had been a friend of Daniel Tuten. Both the defendant and Mr. Tuten were familiar with the layout of the victim's residence. The victim said that his job required that he travel out of town for extended periods of time and that he was gone from his Henderson County residence from the beginning of August 2017 until the end of September or beginning of October 2017. He recalled that immediately upon entering his bedroom upon his return, he saw that a tall dresser "was turned over in the floor," and when he opened the blinds, he saw that the bedroom window was open.

At that point, the victim began looking around the residence to see if any of his property was missing. He said that a 12-gauge "870 pump shotgun" was missing from the top of his bedroom closet. Clips for an AR-15 along with "a 100 round drum full of .223" ammunition was missing from the living room. The victim then went outside to the shop where he kept his race car. Inside, he discovered that "a bunch of [his] shop tools," including welders and air compressors, were missing. Inside a second shop building, the victim found that "a big chop saw," a "speaker box," drill presses, and other tools were missing. The trailer for the victim's race car was missing from a third shop building. The victim observed tire tracks leading from the shop showing where "the race car trailer was pulled around the back side of [the] house." The victim noted that "an 8600 watt generator" and "an aluminum toolbox" were on the race car trailer. The victim estimated the value of the property taken to be "approximately $7,000."

The victim recalled that he communicated with the defendant via SnapChat "a week or two before" he returned home from his work trip. During that conversation, the victim told the defendant that he was not home.

The victim said that he telephoned the police and reported the theft of his property. A day or so later, the victim "gathered up some pictures of some of the items that [were] stolen and . . . made a $500 reward on Facebook." In response to information received related to the Facebook post, the victim "went towards Perry County over there and . . . rode up on Charlie Hall's yard sale." The victim immediately recognized his property among the items for sale, and he telephoned the police. The police arrived approximately 45 minutes later, and the victim was able to reclaim some of his property: "I got the generator, my shotgun, the three drill presses, a couple of power tools, cordless drills, the two spare tires that was my camper spare tires and the extension ladder." He was unable to recover the trailer.

The victim testified that he had previously seen the defendant driving a black Tahoe sport utility vehicle.

-2-

Charlie Hall testified that he supplemented his income by buying property at flea markets and yard sales and then reselling it at his own yard sale. He recalled that at the end of September 2017, Daniel Tuten, whom Mr. Hall had known for years, contacted him via telephone about some property and then came to his yard sale with the defendant. Mr. Tuten and the defendant arrived in a "black SUV, Tahoe-like thing" pulling a trailer. The two men had "[a] welder and a generator and some other tool-like stuff" in the vehicle. Mr. Tuten had previously assured Mr. Hall that the property was not stolen, and, when asked, the defendant "said [the property] was his" and then told Mr. Hall "how he had accumulated it." The defendant told Mr. Hall that "he works on the road so he needed that stuff to work on the road and he was laid off so he was going to have to sell it and then when he went back to work he would replace it." Mr. Tuten did not claim to own any of the property. Mr. Tuten and the defendant brought two loads of property to him, and Mr. Hall gave approximately $700 to Mr. Tuten in exchange for the property.

Mr. Hall listed some of the items for sale on Facebook. Later, the victim contacted him, and then the police came to the location where Mr. Hall was having a yard sale. Mr. Hall returned the victim's property and then "bought a generator back for $200" and returned it to the victim. Mr. Hall was unable to recover some of the victim's property that he had already sold.

During cross-examination, Mr. Hall admitted that he made no mention of the defendant's claiming ownership of the property in his written statement to the police. In that statement, Mr. Hall indicated that the defendant and Mr. Tuten made two trips to sell him items; the first trip included tools and a shotgun while the second trip included a trailer, generator, toolbox, and other tools.

Henderson County Sheriff's Department Investigator Jeremiah Adams testified that he conducted the investigation into the burglary and theft of the victim's property. Investigator Adams said that he attempted to recover fingerprints from the victim's residence but was unable to lift any usable prints because of the rainy weather. Investigator Adams said that, upon interviewing Mr. Hall, he learned that Mr. Hall came into possession of the victim's property on September 26, 2017. He also assisted in the recovery of some of the victim's property. He testified that, despite Mr. Hall's extensive cooperation, he was unable to recover the victim's trailer and several other items.

Investigator Adams said that, based upon information gleaned during his investigation, he elected to pursue charges against both the defendant and Mr. Tuten. After posting bail, Mr. Tuten absconded from the jurisdiction.

During cross-examination, Investigator Adams testified that he also recovered some of the victim's stolen property from a man named Eddie Adams.

Based upon this evidence, the jury convicted the defendant as charged of aggravated burglary and theft of property valued at more than $1,000. Following a sentencing hearing, the trial court imposed concurrent sentences of six years for the aggravated burglary conviction and two years for the theft conviction and ordered the defendant to serve the entire six-year sentence in the Department of Correction ("TDOC"). The trial court recommended the defendant "for placement in Morgan County methamphetamine treatment program, if he qualifies for such placement." The court also ordered the defendant to pay $4,040.00 in restitution to the victim.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant contends that the evidence was insufficient to support his convictions and that the trial court erred by imposing a fully-incarcerative sentence. We consider each claim in turn.

*I. Sufficiency*

The defendant challenges the sufficiency of the convicting evidence, arguing that, although the State established that the defendant had possessed certain property that belonged to the victim, it failed to present any evidence to suggest that it was the defendant who entered the victim's residence in order to take the items. The State asserts that the evidence was sufficient to support both convictions.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence.

-4-

*Id.*

As charged in this case, aggravated burglary is the knowing entry into a habitation as defined by Code section 39-14-401 without the victim's consent and with the intent to commit a theft therein. *See* T.C.A. § 39-14-402(a)(1); -403(a). A "habitation" is "any structure, including buildings, . . . which is designed or adapted for the overnight accommodation of persons." *Id.* § 39-14-401(1)(A). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103(a). Notably, the unsatisfactorily explained possession of recently stolen property, when considered in light of the surrounding circumstances, permits an inference that the individual in possession stole the property or knew the property was stolen. *See State v. James*, 315 S.W.3d 440, 452 (Tenn. 2010); *see also Bush v. State*, 541 S.W.2d 391, 394 (Tenn. 1976); *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Additionally, the jury may "infer a burglary from possession of recently stolen property" when the proof otherwise establishes "a rational connection between possession and participation, when guilt more likely than not flows from possession, and, importantly, when there is some other evidence corroborating the burglary that warrants the inference." *James*, 315 S.W.3d at 452; *see also Tuttle*, 914 S.W.2d at 932 ("Possession of recently stolen goods may also be sufficient evidence to sustain a conviction for burglary." (citing *Brown v. State*, 489 S.W.2d 855, 856 (Tenn. Crim. App. 1972)).

Here, the evidence adduced at trial established that the victim traveled out of town from the beginning of August to the end of September 2017. A few weeks before his return, he communicated with the defendant via SnapChat and indicated that he was absent from his residence. Sometime during the victim's absence, someone entered the victim's residence and the outbuildings on his property and took numerous items. On September 26, 2017, Mr. Tuten communicated with Mr. Hall and indicated that he had several items for sale. Mr. Tuten and the defendant then brought the property to Mr. Hall, who paid them $700 for the items. Mr. Hall testified that the defendant claimed that the property, which included a shotgun taken from inside the victim's residence, belonged to him and that he needed to sell the items because he had been laid off. The victim later learned that the property taken from his residence was at Mr. Hall's yard sale. When confronted by the police, Mr. Hall stated that he had obtained the property from the defendant and Mr. Tuten and then assisted with the recovery of the property and its return to the victim. In our view, evidence that the defendant was familiar with the victim's residence and that he knew that the victim was out of town, when coupled with his possession of the stolen property shortly after the burglary and the unsatisfactory explanation that he provided to Mr. Hall of his possession of the property, was sufficient to support the defendant's convictions.

## II. Sentencing

The defendant asserts that the trial court erred by imposing the maximum, within-range sentence for each of his convictions and by ordering that he serve the entire six-year effective sentence in confinement. The State avers that the trial court did not err.

The presentence report established that the 26-year-old defendant had two prior drug possession convictions. The State exhibited to the sentencing hearing a record from Alcorn County, Mississippi, that indicated that the defendant had pleaded guilty on February 22, 2018, to one count of possession of methamphetamine in exchange for a sentence of eight years to be served as five years' supervised probation.

The victim testified that although much of his property had been recovered and returned to him, other items had not. He testified that a trailer worth $2,800.00, a wench worth $600.00, AR-15 magazines worth $60.00, speaker boxes worth $300.00, and catalytic convertors worth $400.00 had not been returned to him. The victim agreed with the prosecutor that $4,040.00 "sounds about right" for the value of the unrecovered property.

The defendant's step-father, Gary Myrick, testified that the defendant graduated high school with honors and briefly attended community college before electing to enter the workforce. He said that the defendant had worked consistently but that things changed for the defendant when his relationship with the mother of his children became rocky. After his arrest, the defendant moved in with the Myricks and worked for Mr. Myrick's construction company. Mr. Myrick said that the defendant had "stepped up to the plate" to help his parents when they had medical issues and that he helped care for his brother "after his brother had a severe motorcycle wreck and ended up with a traumatic brain injury." In addition, the defendant helped his grandparents maintain their rental property.

Mr. Myrick said that the defendant had been granted a probationary sentence for his Mississippi conviction of methamphetamine possession and that the defendant reported as required and had passed all of his drug screens. Mr. Myrick said that the defendant could work for him if he was granted probation.

During cross-examination, Mr. Myrick said that he did not know that the defendant had tested positive for methamphetamine and Adderall use on the day he was convicted. Mr. Myrick agreed that the defendant probably had a drug problem, saying, "If I was a betting man, I would say yeah. You can't have smoke without fire."

Upon questioning by the court, Mr. Myrick acknowledged that the

defendant pleaded guilty to the possession of drug paraphernalia on December 6, 2016, and that he was sentenced to 11 months and 29 days to be served on probation. The defendant was then arrested in Mississippi for methamphetamine possession on September 7, 2017. The defendant was released on bond that same day. Then, the offense in this case took place on September 26, 2017. Mr. Myrick described the defendant's criminal history as "a little spree," and said that he did not "understand it other than he was having emotional problems." Mr. Myrick said that the defendant had not ever asked for help with his drug problem before his arrest but that he had done so "since he has gotten sober." Mr. Myrick asked the trial court to grant the defendant probation.

The defendant's mother, Jean Myrick, testified that the defendant had lived with her and Mr. Myrick since late September or early October 2017 and that he had always been helpful around the house. Ms. Myrick said that, shortly before his legal troubles began, the defendant's girlfriend "broke up with him because he did work on the road all the time." Ms. Myrick said that the defendant had been unable to see his children since then. Ms. Myrick stated that, as far as she knew, the defendant had complied with the conditions of his probation in the past.

The State asked the trial court to impose a sentence of five years for the defendant's conviction of aggravated burglary and a sentence of two years for the conviction of theft. The State also asked the court to order the defendant to pay $4,040.00 restitution to the victim. The defendant asked the court to impose an alternative sentence so that the defendant could work to pay his restitution, fines, court costs, and child support. He indicated a willingness to take an alcohol and drug assessment and to comply with any treatment recommended by the court.

In arriving at sentences of six years and two years, the maximum within the range for both of the defendant's convictions, the trial court found that the defendant had a history of criminal convictions or behavior in addition to that necessary to establish his sentencing range, *see* T.C.A. § 40-35-114(1), noting the defendant's Hardin County General Sessions Court conviction of possession of drug paraphernalia, his "extended use of marijuana" from 2010 to 2017, and his use of methamphetamine. The court gave great weight to that factor. The court also found that the defendant had failed to comply with previous sentences involving release into the community, *see id.* § 40-35-114(8), observing that the defendant had committed the offenses in this case as well as the drug offense in Mississippi while on probation in Hardin County. The court noted that although the conditions of the defendant's probation in Mississippi, which began in February 2018, required that he abstain from alcohol and drugs, he tested positive for the use of methamphetamine on the day he was convicted in June 2018. Additionally, the court found that the defendant committed the offenses in this case while on bond for the

drug offense in Mississippi. In mitigation, the court found that the defendant did not cause any bodily injury and that he "had a pretty good work history."

The court found that the defendant's continued drug usage indicated that he was "not a good candidate for rehabilitation." The court concluded that the defendant's past behavior indicated that he was not likely to abide by the terms of probation, observing that the defendant had committed three serious felonies while on probation in Hardin County. The court found that measures less restrictive than confinement had recently and frequently "been applied to this defendant without success." The court also noted the defendant's "substantial drug issue" and recommended that the defendant be placed in the methamphetamine treatment program at the TDOC facility in Morgan County.

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise* 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). The abuse-of-discretion standard of review and the presumption of reasonableness also applies to "questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012).

Although the trial court must consider the defendant's potential for rehabilitation in determining whether to impose an alternative sentence, see T.C.A. § 40-35-103(5), "[c]onvicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society and evincing failure of past efforts at rehabilitation" are not considered favorable candidates for alternative sentencing, *id.* § 40-35-102(5)-(6)(A).

That being said, the imposition of an effective six-year sentence in this case mandated the trial court's considering probation as a sentencing option. *See* T.C.A. § 40-35-303(a) ("A defendant shall be eligible for probation under this chapter if the sentence actually imposed upon the defendant is ten (10) years or less . . . ."). Traditionally, the defendant has born the burden of establishing his "suitability for full probation." *State v. Mounger*, 7 S.W.3d 70, 78 (Tenn. Crim. App. 1999); *see* T.C.A. § 40-35-303(b). Such a

showing required the defendant to demonstrate that full probation would "subserve the ends of justice and the best interest[s] of both the public and the defendant." *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990) (quoting *Hooper v. State*, 297 S.W.2d 78, 81 (1956), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 9-10 (Tenn. 2000)).

When a trial court orders confinement and therefore rejects any form of alternative sentencing such as probation, split confinement, or periodic confinement, it must base the decision to confine the defendant upon the considerations set forth in Code section 40-35-103(1), which provides:

> (1) Sentences involving confinement should be based on the following considerations:
>
> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant; . . . .

T.C.A. § 40-35-103(1).

In our view, the record does not indicate that the trial court abused its discretion by ordering a sentence of full confinement in this case. The defendant committed the offenses in this case while on bond for a felony drug charge in Mississippi and committed both the offenses in this case and the Mississippi drug offense while on probation for possession of drug paraphernalia. Additionally, the defendant tested positive for the use of methamphetamine on the day of his conviction in this case despite that he was on probation for the Mississippi drug offense and on bond in this case. The defendant's behavior supports the trial court's finding that measures less restrictive than confinement had frequently and recently been applied unsuccessfully to the defendant.

*III. Restitution*

Although not raised by the parties, we observe error in the restitution order in this case. "As a general rule, courts exercising criminal jurisdiction are without inherent power or authority to order payment of restitution except as is derived from legislative enactment." *State v. Alford*, 970 S.W.2d 944, 945 (Tenn. 1998). Code section 40-35-104 provides that the trial court may order the "[p]ayment of restitution to the victim or victims either alone or in addition to any other sentence authorized by" the statute. T.C.A. § 40-35-104(c)(2). When the trial court orders the payment of restitution, it must satisfy the requirements in Code section 40-35-304. *See id.* § 40-35-304(g) ("The procedure for a defendant sentenced to pay restitution pursuant to § 40-35-104(c)(2), or otherwise, shall be the same as is provided in this section with" certain statutory exceptions not applicable here.). Code section 40-35-304 provides:

> (b) Whenever the court believes that restitution may be proper or the victim of the offense or the district attorney general requests, the court shall order the presentence service officer to include in the presentence report documentation regarding the nature and amount of the victim's pecuniary loss.

> (c) The court shall specify at the time of the sentencing hearing the amount and time of payment or other restitution to the victim and may permit payment or performance in installments. The court may not establish a payment or performance schedule extending beyond the statutory maximum term of probation supervision that could have been imposed for the offense.

> (d) In determining the amount and method of payment or other restitution, the court shall consider the financial resources and future ability of the defendant to pay or perform.

> (e) For the purposes of this section, "pecuniary loss" means:

> (1) All special damages, but not general damages, as substantiated by evidence in the record or as agreed to by the defendant; and

> (2) Reasonable out-of-pocket expenses incurred by the victim resulting from the filing of charges or cooperating in the

-10-

investigation and prosecution of the offense; provided, that payment of special prosecutors shall not be considered an out-of-pocket expense.

*Id.* § 40-35-304(c)-(e).

When setting the amount of restitution in this case, the trial court failed to consider on the record at the sentencing hearing "the financial resources and future ability of the defendant to pay or perform." *Id.* § 40-35-304(d). As the trial court noted, the presentence report indicated that the defendant had no assets and no income. Importantly, the trial court failed to consider that its decision to sentence the defendant to a term of full confinement necessarily precludes his obtaining full-time employment. Moreover, nothing in the record indicates that the trial court considered the defendant's other debts and obligations, including the fines and court costs attendant to the convictions in this case and in the Mississippi case as well as child support for his young children. Because the trial court failed to consider the defendant's ability to pay when setting the restitution order, the case must be remanded for a new hearing on the issue of restitution.

## IV. Conclusion

Based upon the foregoing analysis, we affirm the defendant's convictions as well as the imposition of a fully-incarcerative, six-year sentence. Because, however, the record does not support the order of restitution, we remand the case for a new restitution hearing.

_____
JAMES CURWOOD WITT, JR., JUDGE

-11-